UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CASSANDRA MADISON,

        Plaintiff,

    v.                          Case No. 2:22-cv-2871
                                      Judge Edmund A. Sargus, Jr.
                                      Magistrate Judge Chelsey M. Vascura

BREAD FINANCIAL
PAYMENTS, INC.,

        Defendant.

## OPINION AND ORDER

This matter comes before the Court upon Defendant Bread Financial Payments, Inc.'s Motion for Summary Judgment. (Def. Mot., ECF No. 18.) For the reasons stated below, the Court **GRANTS in part and DENIES in part** Bread Financial's Motion.

## BACKGROUND

Plaintiff Cassandra Madison worked as an Information Technology ("IT") Governance Senior Analyst for Bread Financial—previously known as Alliance Data Systems—from January 2017 until her departure in October 2021. (Madison Dep., ECF No. 18-1, 24:11–20.) Bread Financial issues credit cards on behalf of retail stores, such as Victoria Secret, Pottery Barn, or Express. (*Id.* at 14:22–15:23.) Bread Financial also provides the technology background and marketing programs for clients issuing and using such credit cards. (*Id.*)

Madison was a member of Bread Financial's IT Communications team. (*Id.* at 32:15–33:4.) This action concerns Madison's job duties as an IT Governance Senior Analyst, and whether those duties qualify her as exempt from the requirements of the Fair Labor Standards Act ("FLSA").

## I.    Madison's Job Duties

As an IT Governance Senior Analyst, Madison was not responsible for fixing any technical issues.   (Madison Dep., ECF No. 18-1, at 87:21–88:12.)   Rather, Madison's job was communicative in nature, acting as "a liaison between client relationships and [Bread Financial's] technical groups."  (*Id.* at 36:11–16.)  Her team ranged from six members early in her tenure to only herself and one other person by the time she departed.  (*Id.* at 36:17–37:21.)

When an issue arose, Madison would contact the technical team to learn how an issue was being addressed, report back to the client or client relationship team, and keep them updated throughout the technical team's services.  (Madison Aff., ECF No. 19-1, at PageID # 189–90.)  If the technical team was updating certain technology, Madison would explain those updates to the client or client partnership team.  (*Id.* at PageID # 190.)  Madison attests that these tasks constituted 40–50% of her time, and that she had to follow set company procedures to execute these tasks. (*Id.*)  She does not identify those company procedures.  (*See id.*)

In addition to her communicative tasks between teams and the client, Madison was the point-of-contact for Bread Financial's service desk.  (*Id.*)  She assisted in improving the quality of operations of the service desk, but she did not have any authority to make changes or implement improvements.   (*Id.*)   Madison attests that her service desk responsibilities constituted approximately 30% of her time.  (*Id.*)

The record of evidence before the Court consists of Madison's deposition, affidavit, and documents pertaining to her employment.  In her deposition, Madison testified and clarified the accuracies and inaccuracies contained in two key documents: (A) the IT Governance Senior

2

Analyst job description; and (B) Madison's own resume.[1]  Madison also discussed examples of her day-to-day work.  The Court lays out relevant facts regarding each, in turn.

### A.    IT Governance Senior Analyst Job Description

In her deposition testimony, Madison testified that some of the IT Governance Senior Analyst job description was inaccurate.  Madison testified that the job description inaccurately stated that her role encompassed project management responsibilities.  (Madison Dep., ECF No. 18-1, at 31:20–34:17.)  Similarly, Madison clarified that she and the rest of the IT Communications team were not responsible for managing client relationships, but rather were liaisons between internal business, technical teams, and external clients.  (*Id.* at 35:11–36:16.)  And while Madison's job duties did include developing new and enhancing existing procedures to be used by the entire group, any proposal had to get final approval from management.  (*Id.* at 39:12–40:11.)  Madison repeatedly clarified that she did not "manage" clients or people, and that any place her resume, job description, or performance review described management of incidents or people was more accurately characterized as "handling" them.  (*Id.* at 43:12–44:2; 47:12–49:16; 61:18–62:16.)  Moreover, Madison did not "manage major technical incidents while ensuring correct execution of incident management processes," as her resume previously stated.  (Madison Dep., ECF No. 18-1, at 46:10–14.)  Instead, she engaged in major incidents so she could communicate updates to the business.  (*Id.* at 46:15–21.)

In addition to these clarifications that the job description inflated some responsibilities, Madison confirmed and further clarified other descriptions.  Madison confirmed that her job description accurately stated she was responsible for:

- Taking the lead on developing new, and enhancing existing, procedures to be used by the entire group;

---

[1] Bread Financial also discusses Madison's performance evaluations, but most of her deposition testimony concerned her job description and resume.

3

- Accessing feedback from clients and client sales account teams and then determine the appropriate changes to make for the overall communications policies and procedures that are used by the entire team;
- Writing and articulating effective internal and external communications for any/all incidents that impact brand partners; and
- Accessing individual incident situations and determining the appropriate communication that is required, which needed to translate technical language into business friendly messages that were brief, to the point, and provide the appropriate level of information to all clients and internal business partners.

(Madison Dep., ECF No. 18-1, at 39:12–41:12; Job Description, ECF No. 18-1, at PageID # 127.)

Often, her testimony confirmed the accuracies of descriptions without providing examples of what the description looked like in practice.

### B.     Madison's Resume Description of her Role

Madison confirmed the accuracy of most descriptions on her resume, including the following:

- Analyze escalated issues at the Service Desk and identify/implement solutions that improve service quality;
- Develop support process improvements that result in greater efficiencies;
- Responsible for coordinating messaging to Client Account Teams, Brand partners and customers as it relates to Information Technology & Operations major incidents, environment changes and projects with potential brand partner impact;
- Assist in determining root cause analysis of high priority issues which impact the customer experience; and
- Perform trending and [sic] analysis of incidents to proactively identify problems.

(Madison Dep., ECF No. 18-1, at 44:3–45:13, 49:17–21, 50:3–6; Madison Resume, ECF No. 18-1, at PageID # 124.)

As Madison explained in her deposition, while she was not responsible for managing major technical incidents, she would create communications to internal and external partners during technology outages or degradations.  (Madison Dep., ECF No. 18-1, at 46:10–47:11.)  Madison also dealt with angry clients, choosing to engage her managers if a situation with a "high client" was becoming "extremely escalated."  (*Id.* at 48:14–24.)  Some of Madison's testimony included

4

examples illustrating her role. As an example for her resume's description of managing major technical incidents, Madison said she would sit on calls with the technical teams, relay information to her managers, and create communication updates that notify clients that Bread Financial is aware of technical issues. (*Id.* at 46:10–48:3.)

## C.    Madison's Day to Day Work

In addition to clarifying the accuracy of her job description and resume, Madison testified—albeit briefly—as to what a typical day would look like and what would make someone successful in her role. Madison testified that it was not important for someone to demonstrate good judgment to do her job well. She testified that "there was no real personal judgment that [she] could have made that would have impacted [Bread Financial] in any significant way." (Madison Dep., ECF No. 18-1, at 121:2–23.)

Madison further testified that she would spend time "gathering information" from the technology team. (*Id.* at 122:5–123:19.) She would attend calls with the technology team to understand the progress being made on an incident, then reach out to her manager or senior leadership to determine whether the incident should be reported to external partners. (*Id.*) Madison stated that she would "look to them for guidance" to determine whether a communication should be sent. (*Id.*)

When asked what she would be doing on a normal workday when no outages occurred, Madison testified that she would be reviewing her email, updating client sales partners regarding prior issues, informing them of upcoming changes to servers, work on technical communications, and complete root cause analysis of prior incidents. (*Id.*) In her root cause analysis, Madison would be determining why the incident happened, what Bread Financial did to fix it, and how Bread Financial could mitigate the issue in the future. (*Id.*) Madison stated that the technology teams could not handle these issues alone because she and her team were the communicators. As

communicators, they had the requisite skill to provide client-facing communications that would translate the technical verbiage into language a client could easily digest. (*Id.* at 123:20–124:3.)

## II.     Madison's On-Call Time

Madison seeks to recover overtime pay for all hours worked over forty hours per week, including her on-call time. As the IT Governance Senior Analyst, Madison would have to work on-call shifts throughout the year. Madison would work between seven and 18 shifts each year, and each shift would last seven days. (Madison Dep., ECF No. 18-1, at 83:7–85:7; Madison Aff., ECF No. 19-1, at PageID # 190.) Bread Financial notes that "of the 126 total calls Madison received or made in 2021, more than half occurred normal business hours, more than a third lasted just 1–2 minutes, more than half lasted less than 10 minutes, and more than 70% lasted less than 25 minutes." (Def. Reply, ECF No. 20, at PageID # 201 (citing Madison Dep. Ex. 14, ECF No. 18-1, at PageID # 147–49).)

Madison could work her on-call shift from home. (Madison Dep., ECF No. 18-1, at 83:24–84:18.) She was free to go to the grocery store, watch TV, do laundry, do yard work, surf the web, perform household chores, and cook dinner. (*Id.* at 100:15–104:15.) Bread Financial provided her with a portable laptop and phone, and she was required to respond to each call within 15 minutes of receiving it. (*Id.* at 85:15–24, 94:2–95:4.) Madison attended chiropractic and dental appointments while on call. (*Id.* at 73:11–75:2.)

Madison testified that, although she could bring her laptop with her while running errands, she could not effectively work from her vehicle. (*Id.* at 103:20–105:25.) She preferred to be at her home office. (*Id.*) Bread Financial did not prohibit her from having dinner, taking a shower, walking her dogs, or taking her dogs to the veterinarian while on call. (*Id.* at 106:1–107:4.) Aside from her regular commute to work pre-pandemic, Madison was never required to drive into the office to respond to a call or page during her on-call hours. (*Id.* at 107:19–109:23.) She attests,

however, that because she could not perform her job efficiently without being at her home office, she refrained from spending time with family or attending gatherings. (Madison Aff., ECF No. 19-1, at PageID # 190.)

## III.    Procedural Background

Bread Financial now moves for summary judgment, arguing that (1) Madison is not entitled to overtime pay because she was an administratively exempt employee; and (2) even if she was not exempt, her on-call time spent at home is not compensable. (Def. Mot., ECF No. 18, at PageID # 70–71.) Madison filed a response in opposition to Bread Financial's Motion (Pl. Resp., ECF No. 19), and Bread Financial filed a reply (Def. Reply, ECF No. 20). This matter is fully briefed and ripe for the Court's decision.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that

a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

<h3 style="text-align:center">ANALYSIS</h3>

First, the Court considers whether Madison's job falls within the FLSA exemption for administrative employees. Because the Court finds that there are genuine issues of material fact regarding Madison's status as an exempt employee, the Court then considers whether Madison's on-call time is compensable.

**I.    Whether Madison was Exempt from the FLSA as an Administrative Employee**

An employer is not required to pay overtime to employees who fall within the FLSA's exemption for administrative employees. 29 U.S.C. § 213(a)(1). An employee is "administrative" if (1) they are paid at least $684 per week on a salary basis; (2) their primary duty is performing office or non-manual work directly related to the management or general business operations of the employer; and (3) their primary duty includes the exercise of discretion and independent judgment as to matters of significance. 29 C.F.R § 541.200(a).

Here, Madison concedes the first two elements, only arguing that her primary duty did not include the exercise of discretion and independent judgment as to matters of significance. (Pl. Resp., ECF No. 19, at PageID # 173.) Accordingly, the Court examines (A) Madison's primary duty; (B) the level of discretion and independent judgment Madison utilized; and (C) whether her discretion and independent judgment was used to affect matters of significance. As discussed below, there are outstanding issues of material fact regarding what Madison's primary duty is, whether she exercised sufficient discretion and independent judgment in that primary duty, and whether such discretion and independent judgment pertained to matters of significance.

### A.      Madison's Primary Duty

"Primary duty" does not require that the employee's work involved exercising discretionary authority more than 50% of the employee's time, and the employee's work need not have discretionary authority in all respects. *Burton v. Appriss, Inc.*, 682 F. App'x 423, 431 (6th Cir. 2017); *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004) ("A job duty that occupies less than fifty percent of the employee's time can still be the primary duty if that duty is of principal importance to the employer or if the other duties performed are collateral to that duty.").

The Code of Federal Regulations outlines several factors which are relevant to the analysis of an employee's primary duty:

- The relative importance of the exempt duties as compared with other types of duties;
- The amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and
- The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700.

Madison argues that Bread Financial has failed to articulate what her "primary duty" was. (Pl. Resp., ECF No. 19, at PageID # 175–76 ("Defendant's recitation of Plaintiff's performance evaluation, resume, and job description does not provide any indication of what Plaintiff's 'primary duty' was.").)  The Court agrees in part.

Madison notes that Bread Financial's description of her job duties comes from Madison's resume, job description, and performance evaluations—documents which she characterizes as "vague." (*Id.*)  According to Madison, these materials do not develop a complete and accurate description of what her actual, day-to-day job was. (*Id.* at PageID # 175.)  She argues that Bread Financial did not develop a timeline or description of Madison's day-to-day job duties. (*Id.*)

Rather than relying on those materials, Madison urges the Court to examine her own affidavit testimony regarding her actual day-to-day primary job duties.  (*Id.* at PageID # 176.)

Madison appears to distinguish between her duties as a service desk point of contact and her duties as a liaison.[2]  Bread Financial does not distinguish the two, and never explicitly states what Madison's primary duty is.  (*See generally* Def. Mot., ECF No. 18; *see also* Def. Reply, ECF No. 20.)  The Parties appear to agree that, at a minimum, the liaison duties are part of Madison's primary duties.  Bread Financial describes Madison's role as the "primary liaison between Bread Financial's external technology partners/vendors . . . and its brand and internal business partners who were impacted (or potentially impacted) by technology issues and initiatives."  (Def. Mot., ECF No. 18, at PageID # 72, 79.)  Madison's description is similar.  (Pl. Resp., ECF No. 19, at PageID # 174 ("Plaintiff's main, major, and most important duty was acting as the liaison between the technical team and the client or client partnership team.").)  While Bread Financial does not say, explicitly, that this "primary liaison" role is Madison's *primary duty*, most of Bread Financial's arguments pertain to the same liaison conduct that Madison claims is non-exempt.

There is an issue of fact regarding whether Madison's duties as a liaison and service desk point-of-contact are two distinct duties, or whether they are both part of her primary duty.  Without an explicit argument from Bread Financial on the issue, the Court is weary of considering Madison's service desk responsibilities as her primary duty.  Therefore, the Court will examine whether there are genuine issues of material fact regarding whether Madison's liaison duties included the exercise of discretion and independent judgment as to matters of significance.

---

[2] The Court notes that Madison herself is unclear as to whether her service desk point of contact role was part of her primary duties.  (*Compare* Pl. Resp., ECF No. 19, at PageID # 179 ("[B]eing the service desk point of contact was not Plaintiff's primary duty."), *with* PageID # 174 (discussing the liaison duties and service desk point of contact role as her "primary duties").)

### B.      Exercise of Discretion and Independent Judgment

Courts determine whether an employee's primary duty includes the exercise of discretion and independent judgment as to matters of significance "in light of all the facts involved in the particular employment situation in which the question arises."  29 C.F.R. § 541.202(b).  The Department of Labor has promulgated a non-exhaustive list of ten relevant factors, but Bread Financial only advances arguments for five:

- Whether the employee has authority to formulate, affect, . . . or implement management policies or operating practices (Factor 1);
- Whether the employee carries out major assignments in conducting the operations of the business (Factor 2);
- Whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business (Factor 3);
- Whether the employee provides consultation or expert advice to management (Factor 7); and
- Whether the employee is involved in planning long- or short-term business objectives (Factor 8).

(Def. Mot., ECF No. 18, at PageID # 78–79 (citing 29 C.F.R. § 541.202(b)).)  Additionally, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  29 C.F.R. § 541.202(e).

True, "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c).  However, this implication is not an inescapable certainty; rather:

> [E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.

29 C.F.R. § 541.202(c).

11

Resumes, job descriptions, and performance reviews alone typically do not support granting summary judgment on whether plaintiffs are administratively exempt from FLSA requirements. *See, e.g.*, *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 688–89 (6th Cir. 2001); *Schaefer*, 358 F.3d at 400. "[T]he determination of whether an employee is exempt is an inquiry that is based on the particular facts of his employment and not general descriptions." *Ale*, 269 F.3d at 689 (citing *Brock v. Nat'l Health Corp.*, 667 F.Supp. 557, 565–66 (M.D. Tenn. 1987)). "[C]ourts cannot rely upon the plaintiff's or the employer's description of the plaintiff's position or authority; instead we must 'look at the plaintiff's actual duties' to determine whether she qualifies for the executive exemption." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 503 (6th Cir. 2007) (citing *Ale*, 269 F.3d at 692).

In light of these considerations, the Court must determine whether a genuine issue of material fact exists regarding Madison's exercise of discretion and independent judgment in her role. At the outset, the Court notes that most of the information known about Madison's duties comes precisely from the types of documents the Sixth Circuit has cautioned courts against relying upon. Madison's deposition testimony was, primarily, confirming or denying the accuracy of the descriptions contained in her job description, resume, or performance evaluation. (*See generally* Madison Dep., ECF No. 18-1.) Madison confirmed or denied the accuracy of those descriptions, while clarifying that descriptions of her duties were often cabined to a "communications perspective" or "communications standpoint." (*Id.* at 44:3–8, 46:10–21, 48:25–49:6.) Although Madison claims that Bread Financial did not "develop a complete and accurate description of what Plaintiff's actual, day-to-day job was," Madison was given ample opportunity to clarify, expand upon, and explain such duties. In addition to asking Madison to confirm the accuracy of bullet points on her job description and resume, Bread Financial asked whether anything was missing

12

from her job description (*id.* at 41:13–15) and asked her what a typical day without incidents would entail (*id.* at 121:24–124:3).

Bread Financial argues that Madison's testimony, when combined with the relevant descriptions contained in her job description, resume, and performance evaluations, demonstrates she used sufficient discretion and independent judgment. Bread Financial argues that she decided how to resolve calls based on the breadth of an incident, independently determined what information to share with her supervisors and/or clients, and independently translated technical information to client-facing communications. (Def. Mot., ECF No. 18, at PageID # 79.)

Madison counters that her primary duty did not include the exercise of discretion and independent judgment and that the five Code of Federal Regulations factors cited by Bread Financial do not support its position. Madison argues that she had no authority to make independent decisions about the information she was supplying, only providing objective facts. (Pl. Resp., ECF No. 19, at PageID # 178.) She argues that this duty—one of communicating between teams and clients—is not a major assignment carrying out business operations. (*Id.* at PageID # 179–80.) And she argues that her work did not substantially affect business operations, noting that Bread Financial did not articulate which operations were substantially affected by her duties. (*Id.* at PageID # 180.) Finally, Madison argues that she did not provide consultation or expert advice to management on long- or short-term business objectives, nor was she required to develop strategies to grow relationships and renew business. (*Id.* at PageID # 180–81.)

Madison relies on this Court's ruling in *Wade v. Werner Trucking Co.* regarding Stephen Dean, who was a truck fleet manager. No. 2:10-CV-270, 2014 WL 1091707, at *21 (S.D. Ohio Mar. 18, 2014). In *Wade*, this Court found that there was a genuine dispute of material fact regarding whether a truck fleet manager exercised independent discretion and judgment, or if he was a mere link in the chain of communication between truck drivers and upper management. *Id.*

13

at *21–22.  There, the plaintiff never admitted to exercising discretion in his liaison duties, and direct contact with customers was rare.  *Id.*  Madison has similarly testified that she acted as a liaison, but the job duties she confirmed as accurate demonstrate that she may have been more than a mere "link in the chain of communication."  Madison confirmed that she had direct client contact, and that she would take the technical team's communication and "put it out to the clients in a way that they could understand."  (Madison Dep., ECF No. 18-1, at 123:20–124:3.)

While Bread Financial correctly notes an employee's "self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted," *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018), the Court finds that the present record is insufficient for summary judgment.  The record before the Court here is merely Madison's deposition testimony and accompanying descriptive documents.

In *Mosquera*, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the employer in an FLSA overtime claim.  *Id.* at 574.  There, the plaintiff argued that his "best guess" was that 95% of his work was similar to other non-exempt employees.  *Id.* at 573. The Court held that the plaintiff's guess was insufficient to demonstrate a genuine issue of material fact in light of the compelling motion for summary judgment.  *Id.*  The motion included the plaintiff's co-worker's deposition testimony explaining how the plaintiff used discretion and independent judgment, affidavits from other co-workers attesting to how the plaintiff's work differed in discretionary ways, and a pay disparity between the plaintiff and his alleged non-exempt peers, all in addition to the plaintiff's own resume.  *Id.*  Such facts and evidence are not present here.

As the defendant-company does in *Schaefer*, here Bread Financial points to tasks in Madison's resume that "undisputedly require the exercise of discretion," but "[t]here is insufficient evidence of record . . . to determine how often [Madison] performed them as part of [her] primary

14

job duty or how often they required [her] to exercise discretion or independent judgment." *Schaefer*, 358 F.3d at 405–06 ("It is not enough to merely latch on to words like 'decision,' 'recommendation,' 'judgment,' or 'determine' in the procedures and in [a plaintiff's] deposition testimony.") (citing *Ale*, 269 F.3d at 691).

Madison testified to very few examples of what her work looked like in practice. For example, she testified that, during a major technical incident involving a file delay, she would create a communication that would inform clients that Bread Financial was aware of the issue and would provide updates as the situation progressed. (Madison Dep., ECF No. 18-1, at 46:10–48:24.) Or if Bread Financial experienced a technical outage, Madison would communicate those details to the clients and inform them that the technical team was working on them. (*Id.*) As an example of developing support process improvements, Madison testified she proposed a weekly meeting with senior leadership to review technical projects. (*Id.* at 44:9–45:4.) This testimony does not demonstrate that she was making decisions after comparing and evaluating possible courses of conduct—it appears that her actual work during these incidents may be more akin to the plaintiff in *Wade* who was a link in the chain of communication. Absent more concrete examples demonstrating what Madison's resume or job description meant in practice, the Court does not have sufficient evidence of record to find that Madison was exercising discretion and independent judgment.

### C. Matters of Significance

Finally, Madison's discretion and independent judgment must have been exercised regarding matters of significance. "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). "In assessing the importance of the work, the Court looks to the work itself, not the potential consequences if the employee fails to do the job properly." *Hardesty v. Kroger Co.*, No. 1:16-CV-298, 2020 WL

7053358, at *8 (S.D. Ohio Dec. 1, 2020) (citing 29 C.F.R. § 541.202(f) and *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 997 (6th Cir. 2016)).

Although not directly labeling its argument specifically to the element of "matters of significance," Bread Financial argues that Madison's job duties "had a substantial impact on Bread Financial's business operations" and "significantly impacted [its] operations and financial bottom line." (Def. Mot., ECF No. 18, at PageID # 78, 81.) Madison testified that a degradation to service or system outage "causes a lot of stress to the business," and that both Bread Financial and Bread Financial's customers would suffer losses of sale during such outages. (Madison Dep., ECF No. 18-1, at 30:5–19.) Madison counters that her work did not affect business operations to a substantial degree, and that Bread Financial has not articulated what operations were substantially affected by her duties. (Pl. Resp., ECF No. 19, at PageID # 180.)

The Court agrees that Bread Financial has not articulated what, specifically, was "substantially affected" by any independent judgment Madison may have exercised, or how Madison's alleged discretion pertained to matters of significance.

\* \* \* \* \*

Drawing all reasonable inferences in a light most favorable to Madison as the non-moving party, the Court finds that there are genuine issues of material fact regarding whether Madison's primary duty included the exercise of discretion and independent judgment on matters of significance. Accordingly, the Court **DENIES** Bread Financial's motion for summary judgment regarding whether Madison was properly classified as administratively exempt from the FLSA.

## II.    Whether Madison's On-Call Time Is Compensable

Having denied Bread Financial's motion for summary judgment regarding whether Madison's role was administratively exempt from FLSA overtime requirements, the Court must assess Bread Financial's second argument: that Madison's on-call time was not compensable. For

the reasons stated below, the Court finds that Madison's on-call time is not compensable for her overtime claim.

Madison seeks compensation for her on-call time, which was worked in excess of forty hours each week. Madison was permitted to spend her on-call time at home, and she only returned to the office once or twice to perform work while on-call. The Code of Federal Regulations clarifies that on-call time may be compensable:

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call". An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.

29 C.F.R. § 785.17.

While on-call time spent at home can be compensable, the Sixth Circuit has explained that such time is compensable only if the employee meets a heightened burden:

> [O]n-call time spent at home may be compensable if the restrictions imposed are so onerous as to prevent employees from effectively using the time for personal pursuits. The mere fact that an employer requires employees to leave word where they can be reached will not be sufficient to make the on-call time compensable. Instead, the employees must show that the on-call policy imposes additional burdens that seriously interfere with their ability to use the time for personal pursuits.

*Martin v. Ohio Tpk. Comm'n*, 968 F.2d 606, 611 (6th Cir. 1992); *see also Musico v. Organ Procurement Agency of Mich.*, No. 20-2127, 2021 WL 2979509, at *2 (6th Cir. July 15, 2021).

Here, the restrictions imposed were not so onerous as to prevent Madison from using her time for personal pursuits. Madison testified that she never had to drive into the office to respond to an issue while on-call. She could attend medical appointments, do household chores like laundry or lawn-care, take showers, and she was free to walk her dog.

Madison argues that she could not perform her job efficiently unless she was in her home office. And, because her husband advised her that leaving a laptop in a car was dangerous, she

chose not to go to the grocery store while on call. She attests that she had anxiety while on-call, leading her to opt out of family gatherings. These facts, Madison argues, make her position akin to the plaintiff in *Abdelkhaleq v. Precision Door of Akron*.

In *Abdelkhaleq*, the Northern District of Ohio found a genuine issue of material fact existed regarding whether the plaintiff's on-call restrictions were so onerous as to prevent her from using time for personal pursuit. *Abdelkhaleq v. Precision Door of Akron*, 653 F. Supp. 2d 773, 782 (N.D. Ohio 2009). *Abdelkhaleq* is distinguishable on its facts and procedural posture. First, the plaintiff in *Abdelkhaleq* received as many as ten calls per night and spent roughly 45 minutes on a call on average. *Id.* at 780–81, 783. Second, the court in *Abdelkhaleq* denied the plaintiff's motion for summary judgment because the plaintiff could not demonstrate that there were no issues of material fact regarding whether her on-call time was so onerous as to be compensable. *Id.* at 780–81. The defendant had not moved for summary judgment, so the Court only considered whether the undisputed facts warranted summary judgment in favor of the plaintiff. *Id.*

Madison's circumstances are not as onerous as the plaintiff in *Abdelkhaleq*. She responded to five or less incident calls per week. (Compl., ECF No. 1, at PageID # 4.) Bread Financial notes that, unlike the high volume of calls received by the plaintiff in *Abdelkahleq*, "of the 126 total calls Madison received or made in 2021, more than half occurred normal business hours, more than a third lasted just 1–2 minutes, more than half lasted less than 10 minutes, and more than 70% lasted less than 25 minutes." (Def. Reply, ECF No. 20, at PageID # 201 (citing Madison Dep. Ex. 14, ECF No. 18-1, at PageID # 147–49).)

The fact Madison chose not to engage in certain personal pursuits is of no consequence. Bread Financial's most stringent on-call requirement was that Madison respond to a call within 15 minutes. Bread Financial supplied her with the technology to lessen any burden of access. These circumstances did not "seriously interfere" with Madison's ability to engage in personal pursuits.

18

Accordingly, the Court finds that there is no dispute of material fact regarding whether Madison's at home on-call time is compensable. Because she was free to engage in personal pursuits, the Court **GRANTS** Bread Financial's Motion for Summary Judgment on the basis that Madison's on-call time is not compensable under the FLSA.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Bread Financial's Motion for Summary Judgment (ECF No. 18). Madison is not entitled to pay for her on-call time. The remaining issues include whether Madison is administratively exempt from the FLSA, and if not, the damages she is entitled to for any hours worked over forty, not including her on-call time.

This case remains open.

**IT IS SO ORDERED.**

<u>**2/12/2024**</u>                          <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                **EDMUND A. SARGUS, JR.**
                                        **UNITED STATES DISTRICT JUDGE**